```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA


A.D. ALBERTON &              :    CIVIL ACTION
MARK C. KESSLER              :    NO. 06-3755
                             :
     Plaintiffs,             :
                             :
          v.                 :
                             :
COMMONWEALTH LAND TITLE      :
INSURANCE CO.                :
                             :
     Defendant.              :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                           January 26, 2010

  Before the Court is a request to appoint Plaintiff Mark C. Kessler ("Kessler") as the class representative for Subclass B in accordance with the Court's conditional class certification order entered on January 31, 2008. For the reasons set forth below, the Court concludes that Kessler constitutes an adequate class representative for Subclass B.

**I. BACKGROUND**

  A. <u>Factual Background</u>

  This case involves a class action brought against Commonwealth Land Title Insurance ("Defendant") on behalf of individuals who allegedly were overcharged for title insurance purchased between July 25, 2000 and August 1, 2005. Defendant is in the business of selling title insurance policies. The rates that Defendant may charge for its policies are governed by the

Title Insurance Rating Bureau of Pennsylvania Manual (the "TIRBOP Manual").[1] The TIRBOP Manual sets forth the following mandatory three-tiered pricing structure: (1) Default Rate - applicable when a purchaser does not qualify for a special rate; (2) Reissue Rate - 90% of the Default Rate and applicable when a property owner purchases title insurance within ten years of obtaining a policy on the same property; and (3) Refinance Rate - 80% of the Reissue Rate and applicable when a property owner purchases title insurance within three years of obtaining a policy on the same property.

Section 5.3 of the TIRBOP Manual provides the following with respect to eligibility for the Reissue Rate:[2]

> A purchaser of a title insurance policy shall be entitled to purchase this coverage at the reissue rate if the real property to be insured is identical to or is part of real property insured 10 years immediately prior to the date the insured transaction closes when evidence of the prior policy is produced notwithstanding the amount of coverage provided by the earlier policy.

TIRBOP Manual § 5.3.

Section 5.6 of the TIRBOP Manual provides the following with respect to eligibility for the Refinance Rate:

When a refinance or substitution loan is made within 3

---

[1] The TIRBOP Manual is governed by the Pennsylvania Title Act, 40 Pa. C.S. § 910-1 et seq.

[2] Subsequent to the events giving rise to this litigation, the TIRBOP Manual was amended. All references in this Memorandum are to the version of the TIRBOP Manual in force during the proposed class period.

years from the date of closing of a previously insured mortgage or fee interest and the premises to be insured are identical to or part of the real property previously insured and there has been no change in the fee simple ownership, the Charge shall be 80% of the reissue rate.

Id. § 5.6. Plaintiffs allege that Defendant did not adhere to the mandatory pricing scheme established by these sections by failing to charge the appropriate discounted rate for qualified purchasers of title insurance.

B. Procedural History

On January 31, 2008, the Court entered an order conditionally certifying the class (the "Certification Order"). The Certification Order established two subclasses, pursuant to the following class definition:

> The class shall consist of all persons or entities who, from July 25, 2000 until August 1, 2005, paid premiums for the purchase of title insurance from defendant Commonwealth Title Insurance Company, in connection with a refinance of a mortgage or fee interest with respect to real property located in Pennsylvania that was insured by a prior title insurance policy within ten years of the refinance transaction, and were not charged the applicable Reissue Rate or Refinance Rate discount for title insurance on file with the Pennsylvania Insurance Commissioner. The class shall be divided into two sub-classes. Subclass A shall include all class members whose purchase of insurance from Commonwealth was made within the three years of the prior purchase of title insurance. Subclass B shall include all class members whose purchase of insurance from Commonwealth was made more than three years but within ten years of the date of the prior purchase of title insurance.

Alberton v. Commw. Land Title Ins. Co., 247 F.R.D. 469, 482-83 (E.D. Pa. 2008), rev'd on other grounds, Hunt v. U.S. Tobacco Co., 538 F.3d 217 (3d Cir. 2008). The Certification Order

specified that the class was certified on a conditional basis and final certification was contingent on the appointment of a named plaintiff to represent Subclass B.  Id. at 483.

On March 13, 2008, a Second Amended Complaint was filed that identified Plaintiff Kessler as a member of Subclass B.  On May 13, 2008, Defendant filed a motion for a supplemental class certification order requesting certain revisions to the Certification Order.  During oral argument on this motion, the parties raised the issues of whether Kessler qualified as an adequate representative for Subclass B and whether separate counsel was necessary for each subclass based on the potential conflict between class members asserting claims under § 5.3 and § 5.6. (See Hr'g Tr. 9-10, 27-28, July 22, 2008.)  Plaintiffs posited that they had satisfied their burden of demonstrating that Kessler was an adequate representative for Subclass B and that the potential conflict between the subclasses did not warrant appointment of separate counsel.  The Court elected to treat Plaintiffs' argument as an oral motion to appoint Kessler as the Subclass B representative, and ordered the parties to brief both of the issues raised.  These issues are addressed in turn.

**II. DISCUSSION**

    A.    Applicable Law

The adequacy of a plaintiff to act as a representative for a subclass is governed by Fed. R. Civ. P. 23(a)(4). Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry 'has two components designed to ensure that absentees' interests are fully pursued.'" In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 601-02 (3d Cir. 2009) (citing Georgine v. Amchem Prods., Inc., 83 F.3d 610, 630 (3d Cir. 1996), aff'd, Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997). The first prong of the adequacy inquiry "'tests the qualifications of the counsel to represent the class.'" Id. at 602 (quoting In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 532 (3d Cir. 2004) (internal citations omitted)). The Supreme Court has recognized that the first prong of the adequacy of representation issue includes an inquiry into the "competency and conflicts of class counsel." See Amchem Prods., 521 U.S. at 626, n.20 (citing Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157-158, n.13 (1982)). The second prong of the adequacy inquiry is intended to "uncover conflicts of interest between named parties and the class they seek to represent." Schering Plough, 589 F.3d at 602. (internal quotation marks and citation omitted).

B.  <u>Adequacy of Plaintiff Kessler</u>

Defendant sets forth two alternative arguments as to why Kessler is not an appropriate representative of Subclass B. First, Defendant argues that Kessler does not qualify as an appropriate class representative based upon the class definition itself. Specifically, Defendant contends that the certified class definition creates a "fail-safe" class because the language defines class members as persons who "were not charged the applicable Reissue Rate or Refinance Rate discount." <u>Alberton</u>, 247 F.R.D. at 482. Defendant's position is that because under the current class definition it is not possible to know whether Kessler (or any other claimant) is a member of the class until an ultimate finding of liability is made, i.e., whether the person was charged the "applicable" rate, then Kessler does not qualify as an adequate representative.

Defendant cites to the decisions in <u>Ford Motor Co. v. Sheldon</u>, 22 S.W.3d 444 (Tex. 2000) and <u>Slapikas v. First Am. Title Ins. Co.</u>, 250 F.R.D. 232 (W.D. Pa. 2008); in support of its argument regarding the deficient "fail-safe" definition.

In <u>Ford Motor Co.</u>, the Texas Supreme Court refused to certify a class that was defined as follows:

> All persons who purchased a new 1987-1993 Ford F-Series Truck, 1987-1993 Ford Bronco, 1987-1989 Ford Bronco II, 1987-1992 Ford Ranger or 1987-1989 Ford Mustang in Texas on or after March 8, 1988 which was painted with high build electrocoat or medium build electrocoat and no spray primer and **who suffered past and/or future damage**

> **as a result of peeling or flaking paint on these vehicles caused by a defective paint process** (i.e., high build electrocoat or medium build electrocoat and no spray primer) excluding persons who purchased vehicles pursuant to a fleet account or fleet identification number; and
>
> All persons who purchased a new 1984-1988 Ford F-Series Truck, 1984-1988 Ford Bronco, 1984-1988 Ford Bronco II, 1984-1988 Ford Ranger or 1984-1988 Ford Mustang in Texas prior to March 8, 1988 which was painted with high build electrocoat or medium build electrocoat and no spray primer and who paid Ford or a Ford dealership for a paint repair to their vehicle to repair peeling or flaking paint **caused by a defective paint process** (i.e., high build electrocoat or medium build electrocoat and no spray primer), excluding persons who purchased vehicles pursuant to a fleet account or fleet identification number.

Ford Motor Co., 22 S.W.3d at 448 (emphasis added). The court concluded that this class definition failed to satisfy the clearly-ascertainable requirement for class certification because it was "fail-safe," meaning that the existence of the class was framed in terms of a legal conclusion. Id. at 454. The court reasoned that such a definition prevented the trial court from ascertaining whether a class existed until a determination was made as to the defendant's ultimate liability, meaning that if the plaintiff could not successfully prove liability then no class would have existed to certify in the first place. Id.

In Slapikas, the court considered a similar lawsuit to the one pending before this Court. The basis for that class action was that a Pennsylvania title insurance company was not charging the appropriate rate based on the TIRBOP Manual. 250 F.R.D. at 236-37. The plaintiffs in Slapikas proposed the

following class definition:

> All persons in the Commonwealth of Pennsylvania who, at any time after December 19, 1999:(a) paid premiums for the purchase of residential title insurance from Defendant FA [First American]; (b) **qualified for the Reissue rate or Refinance rate discounts provided in the Title Insurance Rate manual filed by the Title Insurance Rating Bureau of Pennsylvania**; and (c) did not receive the discount specified in the Manual.

Id. at 233-34 (emphasis added). The court refused to certify the class as defined, on the ground that it created a fail-safe class. Id. at 250-51. The court reasoned as follows:

> Finally, First American argues that plaintiffs' class definition is defective, because it is a "fail safe" class that impermissibly determines membership based upon a determination of liability. The court agrees and will amend plaintiffs' proposed class definition to replace "(b) qualified for the Reissue rate or Refinance rate discounts" with "(b) had either an unsatisfied mortgage from an institutional lender or a deed to a bona fide purchaser in the chain of title within ten years of the payment of the premium." This change overcomes the "fail safe" issue and ensures that class members are bound by the determination of liability.

Id.

The second argument advanced by Defendant against appointing Kessler as class representative for Subclass B is that he has failed to provide any documentation to evidence that he refinanced his mortgage within the preceding ten-year period. Defendant contends that absent such evidence, Kessler cannot demonstrate that he is a member of Subclass B.

At the outset, it is helpful to review Plaintiffs' theory of the case in order to resolve each of Defendant's

- 8 -

arguments against appointing Kessler as class representative for Subclass B.  Plaintiffs' theory is that the existence of a mortgage transaction in a class members' respective chain of title is sufficient in and of itself to satisfy the requirement of an existing policy, thereby warranting a discounted rate under the TIRBOP Manual.

With respect to Defendant's first argument, its reliance on both <u>Ford Motor</u> and <u>Slapikas</u> is misplaced as the class in this case is not of same "fail-safe" nature.[3]  In <u>Ford Motor Co.</u>, the court concluded that the proposed class was "fail-safe," however, the class definition in that case depended upon the legal conclusion as to whether the damages were caused by a "defective paint process."  See <u>Ford Motor Co.</u>, 22 S.W.3d at 454.  Similarly, in <u>Slapikas</u>, the class definition was structured such that the court was required to determine whether the individual "qualified" for a discounted rate in order to be an eligible class member.  250 F.R.D. at 250-51.

Unlike these cases, eligibility as a class member here is not dependent upon a legal conclusion.  Although the class definition in the Certification Order refers to the "applicable"

---

[3]  With respect to Defendant's argument regarding the fail-safe nature of the class, it appears that, as a procedural matter, Defendant is actually challenging the class definition.  To the extent Defendant seeks a revision of the class definition, on this or any other grounds, such a request should be presented to the Court independently in the form of a motion requesting such relief.

discounted rate, this does not require a legal determination as to whether a class member qualified for a discounted rate. Instead, in order to be deemed a putative class member, it is only necessary to ascertain whether a person refinanced within the relative time period and whether he/she actually received a discounted rate. Fairly read, the term "applicable" is used to differentiate between the Reissue Rate and the Refinance Rate rather than to signify an entitlement to a particular rate, whether the Reissue Rate or the Refinance Rate.

With respect to Defendant's second argument, that Kessler is not an adequate representative because he provided no documentation to evidence his refinancing transaction, such an argument is unavailing as it is inconsistent with the underlying theory of Plaintiffs' case. Plaintiff Kessler, like other class members, will attempt to argue that a prior mortgage should have appeared in his chain of title and that Defendant should have automatically offered the discounted rate upon learning through a title search that there had been such a mortgage transaction within the applicable ten-year period, regardless of whether Kessler actually requested a discounted rate.

In Kessler's deposition he stated that he was sure that he had completed a refinancing transaction within ten years of obtaining a title insurance policy from Defendant. (See Mark C. Kessler Dep. Tr. 211:8-11, June 25, 2008.) This information is

consistent with Plaintiff's theory of the case.  To the extent
Defendant wishes to contest the legal theory underlying this
case, that goes to the merits and not the adequacy of
representation.  See Alberton, 247 F.R.D. at 477 (finding that
Defendant's argument against typicality for failure to present
evidence of previous title insurance "is essentially another way
of saying that plaintiff's legal theory is wrong," and refusing
to adjudicate the merits of the underlying case at the class
certification stage).

Based upon the above, neither of Defendant's objections
to Kessler's appointment has merit.  Under these circumstances,
Kessler is adequate in all other respects to represent Subclass
B.  Therefore, the Court will appoint Kessler as the
representative for Subclass B.

   C.   <u>Conflict of Counsel for Subclasses</u>

In the Certification Order, the Court recognized the
potential conflict between members of the subclasses based upon
the applicable language for each section of the TIRBOP Manual.
The critical difference is that § 5.3 contains language that a
discounted rate shall apply "when evidence of the prior policy is
produced," and § 5.6 does not.  Id.  The Court explained the
potential conflict as follows:

> The difference in language suggests that one could
> plausibly read § 5.3 to require the purchaser to produce
> evidence of a prior policy, but read § 5.6 as requiring
> a discounted rate when any evidence of a prior policy is
> found, regardless of whether it was produced by the
> purchaser or found elsewhere. In other words,
> Commonwealth may have breached § 5.6 of the Manual, but

> not § 5.3.

Id. (footnote omitted). The Court went on to conclude that because Plaintiff Alberton is bringing a claim pursuant to § 5.6, his interest could conflict with class members bringing a claim under § 5.3. Therefore, if class counsel were to represent both subclasses, they would be put in a position of potentially having to argue that the claims of only one subclass are valid. See id.

It is necessary to appoint separate counsel for each subclass where an actual of conflict of interest exists. See, e.g., Ortiz v. Fibreboard Corp., 527 U.S. 815, 856 (1999) (each subclass requires separate class representatives and counsel in order to eliminate conflicts of interest where they exist); Reynolds v. Nat'l Football League, 584 F.2d 280, 286 (8th Cir. 1978) (theoretical conflicts of interest do not require disqualification of counsel); In re Bendectin Prods. Liab. Litig., 749 F.2d 300, 304 (6th Cir. 1984) (finding that "[c]ounsel whose clients fall in both Subclass A and Subclass B cannot possibly represent both classes as the classes are inherently in conflict with each other" in the context of a class action settlement); Metts v. Houstoun, No. Civ. A. 97-4123, 1997 WL 688804, at *4 (E.D. Pa. Oct. 24, 1997) (Shapiro, J.) (finding that counsel could represent multiple subclasses where no conflict of interest existed); Graveley v. City of Phila., No. Civ. A. 90-3620, 1997 WL 698171, at *6 (E.D. Pa. Nov. 7, 1997)

(Shapiro, J.) ("While plaintiffs' counsel seeks to represent three subclasses, there appears to be no conflict of interest among the classes that would disqualify the same counsel from representing all three.") (internal citation omitted). Therefore, it is only necessary to appoint separate subclass counsel if the Court determines that an actual conflict exists between the subclasses as to the evidence to be produced at trial.

Plaintiffs have represented to the Court thus far that there is only one theory that they will proceed with at trial, namely that evidence of a mortgage transaction in a class members' respective chain of title is itself sufficient to warrant a discounted rate, regardless of whether § 5.3 or § 5.6 applies. At the July 22, 2009 hearing, Plaintiffs' counsel clearly stated that the theory of the case being pursued on behalf of both subclasses was that the "fact that there was a mortgage from an institutional lender [in a class member's chain of title,] that constitutes sufficient evidence of a prior policy to get a discount." (Hr'g Tr. 32:9-12, July 22, 2009.)[4] Based upon the uniformity of legal theory relied upon by both subclasses, the Court concludes that no conflict exists at this

---

[4] This will be the theory which will be litigated at the summary judgment stage of these proceedings.

juncture in the proceedings.[5]

## III. CONCLUSION

For these reasons, Plaintiffs' oral motion to appoint Kessler as class representative for Subclass B shall be granted. An appropriate order will issue.

---

[5] It must be noted, however, that if Plaintiffs choose to proceed with an alternative theory of liability which distinguishes the quantum of proof necessary for Subclass A and Subclass B, then independent subclass counsel will need to be appointed. Therefore, to the extent that Plaintiffs intend to pursue a separate theory of liability which implicates the potential conflict between the subclasses, Plaintiff will be required to articulate such a theory to the Court before motions for summary judgment are filed.